IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | CASE NO. BK16-40787 |
| CORNERSTONE TOWER SERVICE, INC., ) | A17-4050 |
| ) | |
| Debtor(s). ) | CHAPTER 11 |
| OFFICIAL COMMITTEE OF UNSECURED ) | |
| CREDITORS, in its capacity as assignee of ) | |
| Debtor in Possession, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| EBF PARTNERS, LLC, dba ) | |
| EVEREST BUSINESS FUNDING, ) | |
| ) | |
| Defendant. ) | |

## ORDER

This matter is before the court on the plaintiff's motion for summary judgment (Fil. No. 13) and resistance by the defendant (Fil. No. 20). Donald L. Swanson and Elizabeth A. Hoffman represent the plaintiff, and T. Randall Wright represents the defendant. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motion was taken under advisement without oral arguments.

The motion is denied.

The creditors' committee filed this adversary proceeding to recover approximately $27,000 in alleged preferential transfers under a "payment rights purchase and sale agreement" between EBF and the debtor, and now moves for summary judgment. EBF resists the motion, arguing that the agreement was for a sale of future receipts and was not a loan, that EBF was automatically perfected under the U.C.C. when the parties entered into the agreement, and that the payments were made in the ordinary course of the parties' business. The nature of the agreement is a legal question for the court. The § 547(c)(2) defense, as discussed below, requires a factual inquiry and cannot be decided on summary judgment.

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Ricci v.*

*DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are the province of the fact-finder at trial and not of the judge at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250, 255.

The following facts are uncontroverted for purposes of these motions:

1. Cornerstone Tower Services, Inc. ("Cornerstone"), was formed in 1997 and is in the business of erecting and maintaining communication towers, such as cell phone towers.

2. Cornerstone filed a Chapter 11 bankruptcy petition on May 13, 2016.

3. The Official Committee of Unsecured Creditors ("Committee" or "the plaintiff") is acting on behalf of Cornerstone. The Committee was assigned "[a]ll avoidance claims under Chapter 5 (11 U.S.C. § 501 et al.)" pursuant to the terms of the Second Amended Plan confirmed in the underlying bankruptcy case on May 26, 2017.

4. On March 18, 2016, 54 days prior to Cornerstone's bankruptcy filing and within the 90-day preference period, the debtor entered into a "Payment Rights Purchase and Sale Agreement" with EBF ("Agreement").

5. The Agreement provides as follows:

> Seller hereby sells, assigns and transfers to EBF, without recourse (except upon an Event of Default defined in Section 3 of the Seller Agreement Terms and Condition), upon payment of the Purchase Price, the Specified Percentage of the proceeds of each future sale by Seller (collectively "Future Receipts") until the Purchased Amount has been delivered to EBF by or on behalf of Seller. "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card . . . or other form of monetary payment in the ordinary course of Seller's business. BASED UPON SELLER'S CALCULATIONS AND EXPERIENCE IN OPERATING ITS BUSINESS, SELLER IS CONFIDENT THAT THE PURCHASE PRICE PAID BY EBF IN EXCHANGE FOR THE PURCHASED AMOUNT OF FUTURE RECEIPTS WILL BE USED IN A MANNER THAT WILL BENEFIT SELLER'S CURRENT AND FUTURE BUSINESS OPERATIONS.

| Purchase Price $ | $75,000.00 | Purchased Amount $ | $105,000.00 | Daily Payment $ | $875.00 | Specified Percentage | 15% |
|---|---|---|---|---|---|---|---|

> Daily Payment = (Monthly Average Sales x Specified Percentage/Average Weekdays in a Calendar Month

    6. The sale was defined as follows:

2.2 Sale of Payment Rights: Seller represents and warrants that it is selling the Purchased Amount of Future Receipts to EBF in Seller's normal course of business and the Purchase Price paid by EBF is good and valuable consideration for the sale. Seller is selling a portion of a future revenue stream to EBF at a discount, not borrowing money from EBF. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by EBF. If Future Receipts are remitted more slowly than EBF may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to EBF and would not be in breach of or default under this Agreement. EBF is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and EBF assumes these risks based on Seller's representations, warranties and covenants in this Agreement, which are designed to give EBF a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to EBF full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable Interest therein.

    7. The purchase price was $75,000 for which EBF purchased 15% of the debtor's Future Receipts until EBF received a total of $105,000 from the debtor. EBF paid the purchase price to Cornerstone, and thereafter received daily amounts of $875 for 31 business days.

    8. Cornerstone engaged in similar transactions with three other companies – LG Funding, Kalamata Capital and Windset Capital. It appears that these transactions all took place during the last two quarters of 2015 and the first quarter of 2016.

    9. The Agreement contains a security agreement that secures Cornerstone's payment and performance obligations to EBF, and a guaranty by the debtor's principal.

    10. The guaranty provides that "Guarantor's obligations are due at the time of any Event of Default under the Agreement." Such "Events of Default" include, among others, (i) interruption, suspension, dissolution or termination of the debtor's business and (ii) default of any term, covenant, or condition with EBF.

    11. On May 19, 2016, six days after the bankruptcy filing, EBF filed a UCC financing statement to perfect a security interest in:

(a) all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, and inventory, or investment property, as those terms are

defined in Article 9 of the UCC, excluding any of [Cornerstone's] assets that are obligations owed by consumers to [Cornerstone];

(b) all proceeds, as that term is defined in Article 9 of the UCC;

(c) all funds at any time in the [Cornerstone's] accounts, regardless of the source of such funds;

(d) present and future electronic check transactions; and

(e) any amount which may be due to EBF under a certain security agreement and payment rights purchase and sale agreement, including but not limited to all rights to receive any payments or credits.

12. Another of Cornerstone's creditors, Kalamata Capital LLC, filed a UCC financing statement concerning Cornerstone's interests in existing and future contract rights, accounts receivable, and proceeds therefrom, on November 27, 2015.

13. EBF filed a proof of claim in Cornerstone's bankruptcy case on August 25, 2016, in the amount of $83,765.00.

14. EBF did not take any action to exclude any portion of Cornerstone's receipts from the bankruptcy estate.

15. EBF received $27,125.00 in payments during the 90 days prior to the petition date.

16. EBF is listed as an unsecured creditor under the Plan.

17. On September 1, 2017, the Committee filed this adversary proceeding against EBF for recovery of the payments made during the preference period.

18. Cornerstone's schedules declare that, on the bankruptcy filing date, it had total asset values of $1,566,097.28 and total debts of $2,593,694.93, leaving the debtor insolvent at that time by more than a million dollars.

This action was brought to avoid and recover allegedly preferential transfers under §§ 547 and 550 of the Bankruptcy Code. The preference statute is in place to protect debtors and ensure an orderly distribution of assets.

> "Under the Bankruptcy Code's preference avoidance section, 11 U.S.C. § 547, the trustee is permitted to recover, with certain exceptions, transfers of property made by the debtor within 90 days before the date the bankruptcy petition was filed." *Barnhill v. Johnson*, 503 U.S. 393, 394, 112 S. Ct. 1386, 118 L. Ed. 2d 39 (1992). "This rule 'is intended to discourage creditors from racing to dismember

a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy.'" *Lindquist v. Dorholt (In re Dorholt, Inc.)*, 224 F.3d 871, 873 (8th Cir. 2000) (quoting *Jones Truck Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 326 (8th Cir. 1997)).

"Title 11 U.S.C. § 547(b) requires that in order for a transfer to be subject to avoidance as a preference, (1) there must be a transfer of an interest of the debtor in property, (2) on account of an antecedent debt, (3) to or for the benefit of a creditor, (4) made while the debtor was insolvent, (5) within 90 days prior to the commencement of the bankruptcy case, (6) that left the creditor better off than it would have been if the transfer had not been made and the creditor asserted its claim in a Chapter 7 liquidation." *Buckley v. Jeld-Wen, Inc. (In re Interior Wood Prods. Co.)*, 986 F.2d 228, 230 (8th Cir. 1993). The trustee must establish each of these elements by a preponderance of the evidence. *Stingley v. AlliedSignal, Inc. (In re Libby Int'l, Inc.)*, 247 B.R. 463, 466 (8th Cir. B.A.P. 2000).

*Wells Fargo Home Mortgage, Inc. v. Lindquist*, 592 F.3d 838, 842 (8th Cir. 2010).

The Committee asserts the matter falls squarely within the elements of § 547(b) and the defense of § 547(c)(2) does not apply. EBF argues that the agreement is a true sale, not a loan, and is not subject to a preference action because the receipts were not property of the bankruptcy estate.

In the Eighth Circuit, the governing law on the sale vs. loan question is *Lange v. Inova Capital Funding, LLC (In re Qualia Clinical Serv., Inc.)*, 441 B.R. 325 (B.A.P. 8th Cir.), *aff'd*, 652 F.3d 933 (8th Cir. 2011), where the Bankruptcy Appellate Panel affirmed the bankruptcy court's ruling that the recourse provisions in Inova's invoice purchase agreement placed the risk of non-collection on Qualia, so the agreement was a disguised loan rather than a true sale.

In contrast to Inova's agreement and its explicit recourse provisions, EBF's agreement does not contain any such language. Rather, it specifically states that it is intended to be a sale and not a loan:

> Seller represents and warrants that it is selling the Purchased Amount of Future Receipts to EBF in Seller's normal course of business and the Purchase Price paid by EBF is good and valuable consideration for the sale. Seller is selling a portion of a future revenue stream to EBF at a discount, not borrowing money from EBF.

Payment Right Purchase & Sale Agreement, ¶ 2.2 (Ex. A, Fil. 15).

The terms of the agreement establish that it is governed by Florida law. *Id.* at ¶ 4.5. Florida law looks to the substance of the transaction, rather than to the form, to determine usury, and the intent of the parties controls in determining whether there has been a sale or a loan subject to usury laws. *In re Assist-Med., Inc.*, No. 16-31624-H5-11, 2017 WL 5900538, at *3 (Bankr. S.D. Tex. Nov.

27, 2017) (citing *Indian Lake Estates, Inc. v. Special Investments, Inc.*, 154 So.2d 883 (Fla. Dist. Ct. App. 1963) and *Griffin v. Kelly*, 92 So.2d 515 (Fla. 1957)).

> Specific factors that courts have analyzed in conducting a sale-or-loan analysis include:
>
> 1. Language of the documents and conduct of the parties.
> 2. Recourse to the seller.
> 3. Seller's retention of servicing and commingling of proceeds.
> 4. Purchaser's failure to investigate the credit of the account debtor.
> 5. Seller's right to excess collections.
> 6. Purchaser's right to alter pricing terms.
> 7. Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets.
> 8. Seller's retention of right to repurchase asset.

*Wawel Sav. Bank v. Jersey Tractor Trailer Training, Inc. (In re Jersey Tractor Trailer Training, Inc.)*, No. 06-02003 (MBK), 2007 WL 2892956, at *7 (Bankr. D.N.J. Sept. 28, 2007) (citing Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181, 186-94 (1991)), *aff'd*, No. ADV 06-2003 (MBK), 2008 WL 2783342 (D.N.J. July 15, 2008), *aff'd in part, vacated in part, remanded*, 580 F.3d 147 (3d Cir. 2009).

Recourse, the seller bearing the risk of account non-payment, the seller's indemnification of the buyer's loss or expense arising from the agreement, and the buyer's option to have the seller repurchase certain accounts are relevant factors in determining whether the agreement is a true purchase. *Wiers Farm, Inc. v. Waverly Farms, Inc.*, Case No. 8:09–cv–1742–T–30TBM, 2011 WL 1296867 at *3 (M.D. Fla. Mar. 31, 2011) (decided under PACA).

The eight *Jersey Tractor Trailer Training* factors listed above tend to weigh in EBF's favor and support a finding that the transaction was a true sale. First, the document clearly states it was a sale and not a loan, and there is no evidence the parties operated to the contrary. The second factor, recourse, is discussed below. Third, Cornerstone was obligated under the agreement to collect and deposit the receivables into an EBF-approved bank account and permit EBF to make daily withdrawals of the agreed payment of $875. Fourth, there is no evidence regarding whether EBF investigated any of Cornerstone's account debtors. EBF asserts that although it was authorized to do so, such investigation was unnecessary because the creditworthiness of individual accounts was irrelevant as EBF purchased a percentage of the debtor's total receivables.

Fifth, EBF could withdraw only a designated amount from Cornerstone's bank account each day. The balance remained in Cornerstone's possession. Sixth, nothing in the agreement gives EBF the authority to unilaterally change the purchase price. Seventh, concerning Cornerstone's right to alter or compromise unilaterally the terms of the transferred assets, Cornerstone specifically assigned those rights to EBF by agreeing to irrevocably appoint EBF as its agent and attorney-in-fact with full authority to, among other things, collect the amounts due under the agreement from customers

or account debtors. Eighth, there is no provision in the agreement for Cornerstone to buy back its accounts.

Recourse requirements in a contract, which may be characterized as repurchase obligations, collectibility guarantees, or reserves from the purchase price to be released only as receivables come in, often are viewed as indicative of a loan rather than a sale. "'Recourse' refers . . . to the liability of a seller of receivables to the purchaser if the underlying obligors fail to pay the receivables." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 925 (10th Cir. 2004). "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) (decided in the PACA context). "If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan." *Id.*

In the parties' agreement in this case, there is no designated provision for recourse against Cornerstone as there was in the *Qualia* case, where Qualia was obligated to buy back any account for various reasons, including default by Qualia. However, Cornerstone did execute a blanket security agreement for EBF, and Cornerstone's president signed a personal guaranty of Cornerstone's performance. The agreement provides certain protections for EBF against default or adverse action by Cornerstone:

> 3.1 Events of Default. The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with EBF's right to collect the Daily Payment (and payment for arrears, if any) in violation of this Agreement; (b) Seller violates any term or covenant in this Agreement; (c) Any representation or warranty by Seller in this Agreement proves to have been incorrect, false or misleading in any material respect when made; (d) the sending of notice of termination by Seller; (e) Seller transports, moves, interrupts, suspends, dissolves or terminates its business; (f) Seller transfers or sells all or substantially all of its assets; (g) Seller makes or sends notice of any intended bulk sale or transfer by Seller; (h) Seller uses multiple depository accounts without the prior written consent of EBF (i) Seller changes its depositing account or Credit Card processor without the prior written consent of EBF; (j) Seller performs any act that reduces the value of any Collateral granted under this Agreement; or (k) Seller defaults under any of the terms, covenants and conditions of any other agreement with EBF.
>
> 3.2 Remedies. If any Event of Default occurs, EBF may proceed to protect and enforce its rights including, but not limited to, the following:
> A. The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement will become due and payable in full immediately.

    B. EBF may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

    C. If permitted under the laws of the state in which the Seller resides; Seller hereby authorizes EBF to execute in the name of the Seller a Confession of Judgment in favor of EBF in the full uncollected Purchased Amount and enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

    D. EBF may enforce its security interest in the Collateral identified in the Security Agreement and Guaranty.

    E. EBF may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which EBF shall recover Judgment against Seller, Seller shall be liable for all of EBF's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

    F. This Agreement shall be deemed Seller's Assignment of Seller's Lease of Seller's business premises to EBF. Upon an Event of Default, EBF may exercise its rights under this Assignment of Lease without prior notice to Seller.

    G. EBF may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to EBF.

    H. Seller shall pay to EBF all reasonable costs associated with the Event of Default and the enforcement of EBF 's remedies set forth above, including but not limited to court costs and attorneys' fees.

All rights, powers and remedies of EBF in connection with this Agreement may be exercised at any time by EBF after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

Payment Rights Purchase & Sale Agreement (Ex. A, Fil. 15).

  Nothing in the agreement can be construed to be an obligation to repurchase accounts, a guarantee of the collectibility of individual accounts, a reserve to be released only when receivables are paid, or any other sort of recourse. EBF can withdraw only a percentage of daily receipts. The security agreement and personal guaranty come into effect only in the event of default by Cornerstone, which addresses such significant situations as Cornerstone going out of business, selling its assets, not making its receivables available to EBF, or otherwise harming EBF's interest. Under the terms of the parties' agreement, EBF does not have a right of recourse.

  Therefore, the court finds that the agreement in this case is properly classified as a sale rather than a loan. That does not end the matter, however, because the court also finds that EBF's security interest was unperfected, so the debtor retained its rights and titles to the accounts and they are property of the bankruptcy estate. Fla. Stat. Ann. § 679.3181(2) (West) ("For purposes of determining the rights of creditors of, and purchasers for value of an account or chattel paper from, a debtor who has sold an account or chattel paper, while the buyer's security interest is unperfected,

the debtor is deemed to have rights and title to the account or chattel paper identical to those the debtor sold.").

EBF argues that under the terms of the agreement, it purchased a "stream of payments" rather than accounts. The agreement provides EBF will collect a percentage "of the proceeds of each future sale" by Cornerstone. On this motion, EBF attempts to distinguish its purchase of future sale proceeds from the purchase of accounts receivable by asserting that Cornerstone sold it "a general intangible under which the account debtor's principal obligation is a monetary obligation." This is the definition of a payment intangible under the UCC. EBF argues that because it does not have the right to sue any specific account debtor for non-payment, it does not have an interest in Cornerstone's accounts, but instead has a right to a "carved-out payment stream." The distinction is important because a security interest in accounts needs to be perfected by filing, while a security interest in payment intangibles is automatically perfected upon attachment.[1] Fla. Stat. Ann. § 679.3091(3) (West).

The definition section of Revised Article 9 does little to help determine whether the assets at issue are accounts or intangibles. All that it really makes clear is that an account is not an intangible. "Account" means:

> a right to payment of a monetary obligation, whether or not earned by performance, for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; for services rendered or to be rendered; for a policy of insurance issued or to be issued; for a secondary obligation incurred or to be incurred; for energy provided or to be provided; for the use or hire of a vessel under a charter or other contract; arising out of the use of a credit or charge card or information contained on or for use with the card; or as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state. The term includes health-care-insurance receivables. The term does not include rights to payment evidenced by chattel paper or an instrument; commercial tort claims; deposit accounts; investment property; letter-of-credit rights or letters of credit; or rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

Fla. Stat. Ann. § 679.1021(1)(b) (West).

A payment intangible is "a general intangible under which the account debtor's principal obligation is a monetary obligation." Fla. Stat. Ann. § 679.1021(iii) (West). A general intangible is "any personal property, including things in action, other than accounts, chattel paper, commercial

---

[1] A security interest attaches only when value has been given; the debtor has rights in the collateral; and the debtor has authenticated a security agreement that provides a description of the collateral. Fla. Stat. Ann. § 679.2031(2) (West).

tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." Fla. Stat. Ann. § 679.1021(pp) (West).

The tenor of the case law available on this issue suggests that payment intangibles are more aptly found where the assets are payment rights under chattel paper or structured settlements. *See, e.g.*, *NetBank, FSB v. Kipperman (In re Commercial Money Center, Inc.)*, 350 B.R. 465 (B.A.P. 9th Cir. 2006) (holding that payment streams stripped from the underlying equipment leases were payment intangibles, not chattel paper); *Wiersma v. O.H. Kruse Grain & Milling (In re Wiersma)*, 324 B.R. 92 (B.A.P. 9th Cir. 2005) (citing a U.C.C. Official Comment that once a claim arising in tort is settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible), *aff'd in part, rev'd in part*, 483 F.3d 933 (9th Cir. 2007). In contrast, where the payment obligation pledged as collateral is a contractual one, the asset is an account. *U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC*, 519 F. Supp. 2d 515 (E.D. Pa. 2006) (holding that law firm's unmatured contingency fee agreements were accounts rather than general intangibles). Indeed, the *Commercial Money Center* court even stated that "[m]ost monetary obligations are 'accounts.'" 350 B.R. at 476. EBF's argument on this point is a novel one, but there is no evidence the payment rights purchased by EBF are not accounts, even if the contract does not refer to them as such. A right to payment arising from a future sale seems the very definition of an account receivable. Further, EBF's attempt to classify its collateral as the future "receipts" (as opposed to the right to receive the future payments) is not helpful The payments received by Cornerstone – *i.e.* the receipts – are in the form of money deposited into a designated bank account. Money is expressly excluded from the definition of a general intangible (and, thus, from the definition of a payment intangible). The asset purchased by EBF appears to be either an account or money, and any attempt to classify it otherwise is just semantics. Accordingly, EBF's security interest was unperfected and the receivables were property of Cornerstone's estate, which means the trustee's "strong-arm" powers can be utilized to avoid pre-petition transfers of the debtor's property.

Having been unsuccessful in its attempt to remove the transaction from preference territory, EBF invokes the ordinary-course-of-business defense. A trustee may not avoid a transfer made for a debt (1) "incurred by the debtor in the ordinary course of business" of both parties, and (2) paid "in the ordinary course of business" of the debtor and transferee or "according to ordinary business terms." § 547(c)(2). The transferee bears the burden of establishing the ordinary-course-of-business defense by a preponderance of the evidence. *Gulfcoast Workstation Corp. v. Peltz (In re Bridge Info. Sys., Inc.)*, 460 F.3d 1041, 1044 (8th Cir. 2006).

"[T]he court must engage in a peculiarly factual analysis" to determine whether a preferential transfer was made within the ordinary course of business between the parties because there is no precise legal test to apply. *Cox v. Momar Inc. (In re Affiliated Foods Sw. Inc.)*, 750 F.3d 714, 719 (8th Cir. 2014). The purpose of this exception to the preference statute is "to leave undisturbed normal financial relations." *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 527 (8th Cir. 2002) (quoting *Central Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.)*, 153 F.3d 902, 904 (8th Cir.1998)). The court must construe the exception narrowly, "because it

places one creditor on better footing than all other creditors." *Id.* (citing *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir. 1996)).

Most of the time, the analysis focuses on the historical aspect of the parties' transactions with each other and whether the transfers at issue were made in the ordinary course of business between the parties prior to the debtor's financial difficulties: "'[T]he cornerstone' of the inquiry is that the creditor must demonstrate 'some consistency with other business transactions between the debtor and the creditor.'" *Affiliated Foods Sw. Inc.*, 750 F.3d at 719 (quoting *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991)) and noting that "the analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90-day [preference] period reflected 'some consistency' with that practice." *Id.* (quoting *Lovett*, 931 F.3d at 498).

If the parties do not have a lengthy history of doing business together, "'the ordinary course of business may be established by the terms of the parties' agreement, until that agreement is somehow or other modified by actual performance.'" *Gecker v. LG Funding, LLC (In re Hill)*, 589 B.R. 614, 627 (Bankr. N.D. Ill. 2018) (quoting *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 643 (7th Cir. 2003)).

The term "ordinary course of business" implies that the debts were incurred in the routine operations of the debtor and the creditor. *Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390, 398 (Bankr. S.D. Ohio 1998) (citing *Youthland, Inc. v. Sunshine Girls of Florida, Inc. (In re Youthland, Inc.)*, 160 B.R. 311, 314 (Bankr. S.D. Ohio 1993)). A debt will be considered not incurred in the ordinary course of business if creation of the debt is atypical, fraudulent, or not consistent with an arm's-length commercial transaction. *Id.* (citing *Pioneer Technology, Inc. v. Eastwood (In re Pioneer Technology, Inc.)*, 107 B.R. 698, 702 (B.A.P. 9th Cir. 1988); *In re Valley Steel Corp.*, 182 B.R. 728, 735 (Bankr. W.D. Va. 1995); and *McCullough v. Garland (In re Jackson)*, 90 B.R. 793, 794 (Bankr. D.S.C. 1988)).

EBF and Cornerstone entered into this agreement less than two months before Cornerstone filed for bankruptcy protection.[2] Therefore, the parties do not have a baseline history of "routine"

---

[2]It is worth noting that the ordinary-course-of-business exception can apply even when the parties do not have a track record of prior dealings. Even first-time transactions can qualify. *See Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys. Inc.)*, 482 F.3d 1118, 1125 (9th Cir. 2007) ("We agree that first-time transactions may satisfy the requirements of [the exception]."); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003); *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 908 (6th Cir. 1990) ("Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time.").

As the Tenth Circuit Court of Appeals stated:

(continued...)

or ordinary transactions as a layman would understand those terms – their transactions occurred only while Cornerstone was in financial straits. EBF was one of four creditors with whom Cornerstone either borrowed money or sold receivables within six months before the petition date.

As noted earlier in this order, the court must undertake a particularly fact-based inquiry into the applicability of § 547(c)(2). Such an inquiry is especially important here where there is no evidence from the debtor regarding the parties' business relationship. Accordingly, the issue of whether the transfers were made in the ordinary course of business will be set for trial.

IT IS ORDERED: The plaintiff's motion for summary judgment (Fil. No. 13) is denied. The Clerk shall schedule this matter for trial.

DATED: January 3, 2019

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
  *Donald L. Swanson
  *Elizabeth A. Hoffman
  T. Randall Wright
  U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.

---

²(...continued)
 [W] agree with the Seventh Circuit that "'the court can imagine little (short of the certain knowledge that its debt will not be paid) that would discourage a potential creditor from extending credit to a new customer in questionable financial circumstances more than the knowledge that it would not even be able to raise the ordinary course of business defense, if it is subsequently sued to recover an alleged preference.'" *Kleven*, 334 F.3d at 643 (quoting *Warsco v. Household Bank F.S.B.*, 272 B.R. 246, 252 (Bankr. N.D. Ind. 2002)).

*Jubber v. SMC Elec. Prod., Inc. (In re C.W. Min. Co.)*, 798 F.3d 983, 989 (10th Cir. 2015).